## CHARLESTON.

GAULEY & SUMMERSVILLE RAILROAD CO. v. VENCILL *et al.*

Submitted December 15, 1913. Decided February 10, 1914.

1. EMINENT DOMAIN—*Railroad Corporation—Public Use.*
   Issuance of a charter and organization thereunder are not alone conclusive evidence of authority in a railroad corporation to appropriate private property to its use. (p. 651).

2. SAME.
   Before a corporation, though thus chartered and organized, can lawfully condemn private property, it must appear, when denied, that the use is public and not merely private. (p. 651).

3. SAME—*Public Use—Judicial Determination.*
   Whether the use for which private property may be condemned is public, is a question for judicial determination. (p. 651).

Error to Circuit Court, Nicholas County.

Condemnation proceedings by the Gauley & Summersville Railroad Company against H. G. Vencill and others. Judgment for plaintiff, and defendants bring error.

*Reversed, Proceedings Dismissed without Prejudice.*

*G. G. Duff,* and *A. B. Littlepage,* for plaintiffs in error.

*Alderson & Breckenridge,* and *Mollohan, McClintic & Mathews,* for defendant in error.

LYNCH, JUDGE:

By this proceeding, the Gauley & Summersville Railroad Company seeks to condemn a right of way 66 feet wide and 305 feet in length through six acres of land jointly owned by H. G. Vencill and R. L. Neil. By charter it is authorized to construct and operate a railroad from the mouth of Peters creek, a tributary of Gauley river, to the town of Summersville, the county seat of Nicholas county, a distance of 18 miles. The circuit court, having found for the applicant on all the issues joined, permitted the condemnor to enter upon and hold the way in fee, upon payment of the sum ascertained and reported by the commissioners appointed for the purpose. From these findings Vencill and Neil obtained a writ of error.

The Kanawha & West Virginia Railroad Company owns, and in part operates, a right of way for railroad purposes from Charleston to the mouth of Peters creek, via Elk river and Blue creek to Morris fork, and, crossing the water-shed between Blue creek and Gauley river, to Swiss via Belva and other minor points; its right of way not being occupied by it between Morris fork and Belva, and between Swiss and the mouth of Peters creek. Its railroad is in operation from Charleston to Morris fork, a distance of about 25 miles, and from Belva to Swiss, a distance of about four miles. From Swiss to the mouth of Peters creek, a terminus of the Gauley & Summersville railroad, a distance of eight miles, the Flynn Lumber Company, under some arrangement not definitely stated, operates a log railroad upon the right of way of the Kanawha & West Virginia company, which furnishes the rolling stock for that purpose but not the engine.

As variously estimated by witnesses, the Flynn Lumber Company owns from ten to seventy-five per cent of the timber and timber lands along the route projected by the condemnor. Its mills are located at Swiss, to which point it operates the log road from the mouth of Peters creek for its sole convenience, and not for public use. It has no facilities for serving, and does not pretend to serve, the public. While at times it carries passengers and freight, it does so only at its pleasure.

The landowners deny the right of the applicant, the Gauley & Summersville Railroad Company, to exercise the state's authority to condemn. Their principal contention is that the real condemnor is the Flynn Lumber Company, under cover of a different name as a railroad corporation, the principal stockholders of both being substantially the same persons. They deny the public character of the railroad as projected, and assert that when constructed, if constructed at all, the railroad will be dominated and controlled by, and devoted to the exclusive use of, its promoters, the lumber company, and that thereafter it will not be or become a common carrier. The main question, then, is: Is the land sought to be appropriated for a public or for a private use?

The issuance of a charter to a railroad corporation, and an organization thereunder, while essential preliminary steps, do

not conclusively establish the right to appropriate private property to a public use. Whether any such corporation may assert such right frequently becomes a question for judicial determination, in view of all the facts and circumstances pertaining to the particular case. *Railway Co.* v. *Coal Co.*, 62 W. Va. 185. The authoritites generally so hold.

For several years, from two to seven as stated by different witnesses, the Flynn Lumber Company endeavored to acquire, and during that period did acquire, by grants to it in fee from landowners along the proposed route, rights of way for a private lumber railroad to haul its timber from the forests to its mills at Swiss. Since the date of the charter and organization of the railroad company, the lumber company has also acquired, and still retains, title to other rights of way in its own name. Failing to agree with Vencill and Neil, the lumber company, as defendants insist, obtained a charter and organized a railroad corporation for the sole purpose of acquiring *in invitum* that which the lumber company could not otherwise obtain.

This purpose further appears, as the landowners likewise insist, from the additional circumstances that the lumber company has furnished the funds so far expended in the promotion of the railroad, of the capital stock of which only $500 of the $10,000 gross amount authorized by the charter has been paid to the treasurer of the railroad company: a sum inadequate to defray the expenses incident to the two or three miles of constructive track work already partially completed near the mouth of Peters creek, and over which the lumber company operates its lumber road in connection with the Kanawha & West Virginia right of way thence to Swiss.

W. A. Porter, president of the Gauley & Summersville Railroad and general manager of the Flynn Lumber Company, in negotiations with Vencill and Neil for rights of way for the private road, refused their request for the haulage of their timber to Swiss on its way to market. He stated to Vencill that he "would not make any agreement to haul with any one, because" the Flynn Lumber Company "could not afford to have opposition in the lumber business in Nicholas county and build a road; it would not pay". Vencill also testified: "I told Porter I did not want a price on it (the right

of way), that what I wanted was service over the road when the road was built. He replied that I could not get it. I told him all I wanted was service over the road with reasonable rate connections with other railroads for transportation. He said he would not agree to give any body that, and I says you can not get my land, and he says if we have to charter a railroad to get our timber out we will make the rate so high you cannot afford to pay". Or, as Neil states: "Mr. Porter wanted to buy a right of way through this property for a lumber road. I told him I did not want to sell it for a private road, but to get a charter and we would let him have a right of way as far as I was concerned in it. He told me a log road up Peters creek would be better for me and the people than a chartered road. I contended with him that it would not. He told me there was no law to compel them to operate the railroad, if they had the charter, any longer than they wanted to, and if they had to charter one to get their timber out they would do it, and take their timber out as they built the road up Peters creek, and when they got their timber out they would take up their road, and we would not be in any better shape than we would with a log road".

This testimony of the landowners Porter denies in part only, and that denial is rather an explanation. He says they demanded in general terms railroad facilities, implying transportation to market. But the demand was not so general. Upon a fair interpretation, it was limited to haulage to Swiss, the same point to which the lumber company proposed to haul its lumber. It was this request that Porter refused. Properly interpreted, the refusal means that, when the road is constructed, the company proposes to serve the public only as far as the mouth of Peters creek, and the Flynn Lumber Company a further distance to Swiss over the Kanawha & West Virginia right of way. In other words, while the applicant may haul for the lumber company to Swiss, by using the right of way of the Kanawha & West Virginia from the mouth of Peters creek, now unoccupied save by the lumber company, it can not be compelled by law or otherwise to haul for the public as far as Swiss, where the Kanawha & West Virginia operates its road to Belva. The intention, obviously apparent, is to afford facilities to the lumber company to Belva,

73 W. Va.

and to deny them to the public (meaning the people whose purposes should be promoted) any freight or transportation facilities by railroad connections any farther than the proposed railroad terminal at the mouth of Peters creek, where no accommodations exist or are in contemplation so far as appears from the record. This fact lends further credibility to the defense urged by the landowners.

While the circumstances thus appearing, whether taken singly or collectively, are not controlling to the extent warranting denial of the ordinary right to condemn, they may, nevertheless, be considered in so far as they indicate or establish a lack of intention to serve other interests than those of the real sponsors and promoters of the enterprise except under legal compulsion. That lack of intention is clearly manifest. The witness Porter, speaking for the two companies, frankly, but without further explanation, so advises the court. He withholds any information he may possess on the question whether the constructive work begun by the company of which he is general manager will be prosecuted with diligence to completion by the company of which he is president; or whether, by delaying final completion for ten years under the provisions of §66, ch. 54, Code 1906, he as such general manager and president may so plan the progress of the work that at the expiration of the ten year period the Flynn Lumber Company may not need the services of the railroad and therefore abandon it. In other words, is the company acting in good faith in its efforts to build a railroad? or is the charter and organization a mere subterfuge, to secure by condemnation rights of way not otherwise obtainable, for a use intended only for private purposes?

That the lumber company sought to avoid the burden and responsibility of a common carrier is obvious. That it will now willingly perform all the essential functions of a public service corporation, or that it intends in good faith to serve the public, is not obvious, in view of the unexplained statements of its chief executive officer.

Its legal advisers, however, admonish us of the provisions of law by which it may be compelled to discharge its public corporate functions. But they do not venture to suggest that the railroad company will not, as suggested by Porter and as

perhaps it may, abandon the road whenever and as soon as the Flynn Lumber Company has removed and marketed its lumber. That it can or may do so is an open question. In 23 Am. & Eng. Enc. L. 727, it is said that "where there are no special circumstances, or direct statutory requirements, the decisions are at variance on the question of an implied duty to continue the operation of the road; but by the weight of authority the determination of such matters is within the discretionary power of the corporation, and its action is subject to legislative control, or, in a proper case, to a forfeiture of the franchise". The company may construct and equip the road with this purpose in view. It not only may do so, but the attitude of Porter indicates that it will probably do so.

That private property shall not be taken or damaged for public use without just compensation, §9, Art. 3, Const., equally denies the right to take private property for private use *in invitum,* either with or without compensation. *Varner* v. *Martin,* 31 W. Va. 534; *Hench* v. *Pritt,* 62 W. Va. 270. In the last cited case, this court held unconstitutional an act of the legislature authorizing lumber corporations to invoke the right of eminent domain. We may therefore appropriately inquire whether a lumber company can, through the medium of a public railroad corporation, accomplish that which, although authorized by the legislative department of the state government, it could not accomplish as a private corporation. That is the ultimate effect, the unavoidable result, if the applicant here may be permitted to condemn, especially when the purpose plainly apparent is to do by indirection what it could not do in its own name. A ten thousand dollar railroad corporation would not, at least on its capital stock, construct and equip even an 18 mile railroad. Of course, its credit is not limited by its authorized issue of stock. But a financially strong sponsor like the Flynn Lumber Company, the real though not the ostensible railroad company, can construct and equip many more than 18 miles of such roads. As the record now stands, we are unable to agree with the applicant that it has the right to appropriate to its uses the lands sought to be condemned.

The public necessity for the road is not urgent. No witness so testifies. Several say it is not necessary; that there

is no public demand for a railroad; that the proposed road will operate to prejudice the construction of a substantially beneficial public service railroad in Nicholas county. Many courts decline to grant the right to condemn in any particular case until the applicant shows such public demand or necessity, if the right is contested for want of necessity—a reasonable rule. Why should one whose title to land claimed by him is clear be required to assume any burden of proof against one who asserts a hostile superior right? But, even if he assumes the burden, as other courts hold, after the condemnor has established a prima facie case, that burden has been met in this instance. The whole record points to but one legitimate conclusion: an effort by a private company to engage in the railroad business in order to subserve its own private interests under the guise of a railroad corporation.

The benefit to accrue to the public from the construction and operation of the road is merely an incident to the main purpose, the transportation facilities of the Flynn Lumber Company. We do not mean to say that, because private interest will primarily be promoted, the right to condemn must be denied. Such interests ordinarily are benefited. Otherwise, capital could not be induced to engage in internal improvements so essential to the public welfare, comfort and convenience.

But such right is properly denied where an evasion of the constitutional inhibition against the taking of private property for purposes purely private is the chief inducement or incentive for the appropriation. The holding and discussion in *Wiedenfield* v. *Railroad Co.*, 48 Fed. 615, is peculiarly pertinent when applied to the facts of this case. The holding is: "A railroad to be built solely for the private use of the controlling stockholder in conveying tan bark from a certain tract of land to his mills is not entitled to exercise the right of eminent domain, though the company is organized under Act Pa. April 4, 1868, which provides for the formation and regulation of public railroad companies."

The case was heard on affidavits, which the court by Reed, Judge, said were sufficient to "satisfy me that the purpose of the organization of the railroad company was a private one, namely, to reach and transport the bark belonging to or pur-

chased by Healy & Son for use at their tanneries. Although its promoters profess that it is organized for a public purpose, yet they have failed to show any public use or necessity for the railroad, or any public traffic it will obtain when constructed. Healy and Brown admit their purpose in subscribing to the stock was to secure means of reaching the bark they needed for the tanneries; and, as the stock is held by themselves, their attorneys and business associates, it is probable that their motive in subscribing to the stock actuated all the subscribers for one share each. The company is organized for the short time of ten years, and is manifestly intended to meet a temporary necessity. It follows, therefore, that its stockholders are endeavoring to use its corporate powers, including that of eminent domain, for a private purpose.'' As heretofore stated, the stockholders of the Flynn Lumber Company and the Gauley & Summersville Railroad Company, while not identical, are substantially the same persons. Those of the former who are active in promoting the railroad own a controlling interest in both companies. The proof recited impliedly, if not conclusively, warrants the conviction that the real purpose of the railroad organization is to furnish facilities for the transportation of the lumber company's timber to its mills at Swiss, and that when this purpose is acomplished the railroad will be abandoned. Porter admits, at least Vencill and Neil so testify, that a railroad over the proposed route will not pay; that the company will construct it only when and as necessary and convenient for the removal of the timber, and that thereafter the railroad company can not legally be required to maintain and operate its road;—in other words, that it will, or at least may, then abandon the railroad.

Where, from the nature of the business, the purposes to be subserved, and the manner in which a railroad is to be conducted, it is clear that no obligation will be assumed to the public or liability incurred other than such as pertains to all strictly private business, then the use is not a public use. *Stratford* v. *Greenboro*, 124 N. C. 127; *Matter of S. R. C. R. Co.*, 128 N. Y. 408; *Matter of E. B. W. & M. Co.*, 96 N. Y. 42; *Dice* v. *Sherman*, 107 Va. 425. In all proceedings to condemn private property, the character of the business to be done and the manner of doing it must be considered in de-

termining whether the proposed use is public or private. *Sholl* v. *Coal Co.,* 118 Ill. 487.

For the reasons stated, we are of opinion to reverse the judgment of the circuit court, and dismiss the proceedings, without prejudice.

*Reversed, Proceedings Dismissed without Prejudice.*